### In re SPANCRETE OF FLORIDA, LLC, Debtor.

No. 9:05–bk–06482.

United States Bankruptcy Court,
M.D. Florida,
Fort Myers Division.

Dec. 22, 2005.

Andrew T. Jenkins, Tampa, FL, for Debtor.

### ORDER ON MOTION FOR RELIEF FROM STAY

(Doc. No. 103)

ALEXANDER L. PASKAY, Bankruptcy Judge.

THE MATTER under consideration in this Chapter 11 case of Spancrete of Florida, LLC (Debtor) is a Motion for Relief from Stay (Doc. No. 103), filed by CORE Construction Services Southeast, Inc. d/b/a/ CORE Construction (CORE) (the Motion). In the Motion, CORE seeks actually not relief from the automatic stay in the orthodox sense, but a determination by this Court that certain funds placed on deposit with HHG III, Inc. d/b/a/ Employee Professionals (Employee Professionals) are not property of the estate of the Debtor and that CORE is entitled to the funds in dispute. The facts relevant to the resolution of the dispute as established at the final evidentiary hearing can be briefly summarized as follows:

On June 8, 2004, the Debtor and CORE entered into a construction contract concerning a condominium complex referred to as Artisan Park Club (Artisan Park). It was the Debtor's obligation under this contract to supply and install pre-cast, hollow-core concrete plank and it was CORE's obligation to pay to the Debtor the price agreed upon and fixed by the contract. (CORE Exh. 1.) On September 17, 2004 the Debtor and CORE entered into a second construction contract referred to as Sonoma Phase II, Inc. condominiums (Sonoma Phase II). The terms of the Sonoma Phase II contract were basically the same as that fixed by the Artisan Park contract. (CORE Exh. 2.) Pursuant to the terms of each contract, CORE was required to make monthly progress payments to the Debtor for the products supplied and actually installed by the Debtor.

Near the end of 2004 the Debtor began to experience financial problems. CORE was aware of the problems but anxious to use the services of the Debtor, and was especially interested in ensuring that it would receive the property supplied and installed on these two projects on a timely basis. To assist the Debtor, CORE began to make payments directly to certain of the Debtor's suppliers and vendors and would debit these payments against the progress payments that were due and owing to the Debtor during any given payment period.

CORE would treat these payments made to third parties as payments made to the Debtor and correspondingly offset these amounts against the amounts due and owing under the contracts. This arrangement permitted the Debtor to oper-

ate its business and to perform under the contracts.

The parties are not in agreement as to the legal nature of these payments to third parties and the corresponding offsets. It is the Debtor's position that these transactions were in fact contributions to capital by CORE. It is CORE's position that these transactions were loans made to the Debtor for the purpose of assisting the Debtor to complete the Artisan Park and Sonoma Phase II contracts.

One vendor paid under this system was Employee Professionals. The Debtor used Employee Professionals to handle its payroll and also to manage the compensation services for the employees of the Debtor. Under the arrangement with CORE, if the Debtor received an invoice from Employee Professionals for which it did not have sufficient funds, the Debtor would forward the invoice to CORE for payment.

The first payment CORE sent to Employee Professionals on behalf of the Debtor was in payment of an invoice dated January 14, 2005, submitted by Employee Professionals, totaling $51,490.18. (CORE Exh. 6.) For this particular payment the description on the wire transfer receipt shows, and the subcontractor payment record confirms, that CORE in fact debited the sum of $51,490.18 against the amounts owed to the Debtor under the Artisan Park contract. (CORE Exhs. 4 and 6.)

On January 20 and 27, 2005, respectively, CORE paid under Employee Professionals invoices, dated January 21, 2005 and January 28, 2005, respectively, $39,532.31 and $40,996.54. (CORE Exhs. 7, 8.) These two payments were also debited against the amounts due to the Debtor under the Artisan Park contract. (CORE Exhs. 4, 7, and 8.) All payments to Employee Professionals by CORE were made by wire transfer. (CORE Exhs. 6, 7, and 8.)

Employee Professionals became concerned about the Debtor's financial stability. Therefore, on February 1, 2005, Employee Professionals sent a letter (the Letter) to the Debtor requesting a $45,000 "deposit", to be used in the event the invoices submitted by Employee Professionals for services rendered were not paid. (Debtor Exh. 8.) More specifically, the Letter provided, and it was understood, that Employee Professionals would hold the $45,000 on deposit until the final payroll of the Debtor was completed and use the amount only in the event that the Debtor ceased operations and the outstanding balances remaining on any invoices remained unsatisfied.

It is fair to infer that the Debtor did not have the amount of the deposit requested by Employee Professionals, and that the Debtor forwarded the letter to CORE, requesting assistance. On February 4, 2005, CORE made a payment to Employee Professionals in the amount of $89,343.09 by wire transfer. (CORE Exh. 9.) This amount included the sum of $44,343.09 for payroll services rendered by Employee Professionals invoiced on February 4, 2005, and the sum of $45,000, which was the deposit requested by Employee Professionals. It is without dispute that CORE debited the sum of $44,343.09 against the progress payment due to the Debtor on the Artisan Park contract and debited the $45,000 payment against the progress payment due to the Debtor on the Sonoma Phase II contract. (CORE Exhs. 4, 9; Debtor Exh. 7.)

After making these payments, CORE continued to make payments to the Debtor's vendors. These payments included a wire transfer on February 17, 2005 in the amount of $53,212.17 to Employee Professionals for its invoice dated February 17, 2005. (CORE Exh. 10.) As earlier, this

amount was debited against the progress payments due to the Debtor under the Artisan Park contract. (CORE Exhs. 4, 10.)

On April 7, 2005, the Debtor filed a Petition for relief under Chapter 11 of the Bankruptcy Code. Shortly after the commencement of the case, Employee Professionals used the $45,000 deposit described earlier to meet the Debtor's weekly payroll obligations twice: once in amount of approximately $28,000 and the second in the amount of approximately $16,000. As requested by Employee Professionals, the Debtor did replenish and replace the deposit which was used up by making a payment in the full amount of $45,000.

There is no question and this record leaves no doubt that the $45,000 to replace the exhausted deposit were funds paid by the Debtor and no part of the same was supplied or furnished by CORE.

■ As noted earlier, facially CORE seeks relief from the automatic stay, but in reality it seeks a determination that the funds on deposit with Employee Professionals is not property of the Debtor's estate, thus it is free to recover the funds and use them as a setoff against amounts due to the Debtor under the contracts. Whether CORE is entitled to execute upon any interest it may have in the funds on deposit depends on whether the funds are property of the estate. Property of the estate is broadly defined to include "all legal or equitable interests of the debtor in property as of the commencement of the case," and includes property "wherever located and by whomever held." 11 U.S.C. § 541. The scope of § 541(a) is broad. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983).

■ It appears from the record that the funds paid by CORE to Employee Professionals were credited against payments owed to the Debtor under the two contracts. Even assuming that the $45,000 originally put on deposit with Employee Professionals was never intended to ultimately become property of the estate, the result is unchanged. Assuming the parties intended the money to be held in escrow by Employee Professionals, to be used in the case the Debtor was unable to pay any outstanding invoices, and in the event the Debtor ceased operations and the outstanding balances remaining on any invoices remained unsatisfied, the funds were in fact used to satisfy outstanding invoices. This is similar to the occurrence of the conditions precedent to an escrow agreement, entitling one party to receive the funds previously held.

When the funds on deposit were applied by Employee Professionals to outstanding invoices and subsequently replaced by the Debtor's own funds, any claim CORE had to the deposit was extinguished. After the initial $45,000 deposit was used to satisfy outstanding invoices, there was no longer a deposit on hand with Employee Professionals. The $45,000 currently on deposit with Employee Professionals came from funds of the Debtor, from its operations, and CORE never had any cognizable interest in the funds.

This Court has considered *T & B Scottdale Contractors, Inc. v. United States*, 866 F.2d 1372 (11th Cir.1989), and finds that it is not controlling under the facts presented in this case. In *T & B*, R & R, the debtor/subcontractor, had a joint bank account with T & B, a general contractor, and the debtor's contracts with the contractor expressly stated that the funds in the account were to be used only to pay materialmen. The court held that where funds deposited in a bank account in the debtor's name were meant solely for oth-

ers, those funds, held for the benefit of another, were not property of the estate.

The facts involved in the present dispute are distinguishable from those in *T & B*. As in the instant case, R & R would forward to T & B any unpaid invoices, and T & B would deposit enough money into the account to cover that invoice. However, the joint account of T & B and R & R, as well as the contract, were explicit with regards to all funds being on deposit for the materialmen's benefit. The letter requesting the deposit contained no such terms, and there is nothing in the record to establish any such terms between CORE and the Debtor.

Additionally, in *T & B* the funds at issue were not property of the estate because they were earmarked for a party other than the debtor. It was "undisputed that the funds were meant solely for the materialmen." *T & B*, 866 F.2d at 1376. Here it is unclear for whose benefit the funds were placed on deposit: clearly it was to ensure that Employee Professionals would get paid, but also to ensure that the Debtor would continue to receive services it needed and its employees would continue to receive their salaries.

Additionally, the difference between the funds at issue in *T & B* and the funds currently at issue is an important one. The trustee in *T & B* claimed as property of the estate money held in a bank account in the debtor's name. Here, the Debtor claims as property of the estate funds that it paid to replace a deposit, exhausted according to the terms contemplated when the deposit was originally made. The funds at issue in this case were actually paid to Employee Professionals by the Debtor, not held by the Debtor for the benefit of Employee Professionals.

Based on the forgoing, this Court is satisfied that the $45,000 currently on deposit with Employee Professionals came from funds of the Debtor, and CORE never had any interest in the funds. This being the case the funds currently on deposit are property of the estate protected by the automatic stay, there is no provision in the Bankruptcy Code that grants the relief sought by CORE, and the Motion should be denied.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Motion for Relief from Stay (Doc. No. 103), filed by CORE Construction Services Southeast, Inc. d/b/a/ CORE Construction, be, and the same is hereby, denied.

DONE AND ORDERED.